[Criminal No. 642.   Filed March 16, 1927.]

[254 Pac. 467.]

CHARLES J. BLACKBURN, Appellant, v. STATE, Respondent.

Messrs. Struckmeyer, Jennings & Strouss and Mr. L. M. Laney, for Appellant.

Mr. John W. Murphy, Attorney General, Mr. Earl Anderson and Mr. Frank J. Duffy, Assistant Attor-

neys General, Mr. Jesse A. Udall, County Attorney, and Mr. Ralph Bilby, Special Counsel, for the State.

McALISTER, J.—Charles J. Blackburn, appellant herein, was convicted of the murder of one Miguel Bernal and the death penalty imposed. From this judgment and the order overruling his motion for a new trial he appeals.

The sufficiency of the evidence to support the verdict is not raised, but the disposition of the questions presented by the assignments will more readily appear if a rather full statement of the facts is given. Miguel Bernal came to Arizona from Mexico in 1919 and located in the vicinity of Mesa, Maricopa county. Upon arrival he began work as a farm laborer, and in the main followed this occupation in that neighborhood up to the time of his death. He met appellant soon after reaching here, and toward the last of April, 1925, entered his employ in this capacity at a wage of $15 per week, this relation continuing, according to the latter, until July 1st following, when he began working appellant's farm under a crop-sharing contract.

On October 30th thereafter appellant and Bernal, traveling in the latter's Ford car, went to Safford, Arizona, for the purpose, according to the former of purchasing dairy cows, and remained there until the afternoon of November 2d, when they returned to their home, the trip being without result so far as the buying of cows was concerned. On the following day they left for Safford again, going over the same road, and arriving there on the 4th, having spent the night of the 3d in Miami, the purpose of this trip, according to appellant, being likewise to purchase dairy cows as well as to ascertain the name of a Mexican living in the vicinity of Safford who knew a party in Casa Grande owning a herd of Jerseys he desired to sell. They left Safford or the Gila

Valley for Globe some time in the afternoon of that day, it being their intention, appellant testified, to go to Casa Grande to look at the herd there, this trip to Safford having also resulted in the purchase of no cows, and between four and five o'clock they came to the place where the road descends from the hill to the bridge across the San Carlos River. Turning abruptly to the right or northwest at this point, as one goes toward Globe, the road starts down a seven or eight per cent grade, and is dug out of the side of the hill for two or three hundred yards, there remaining a more or less perpendicular wall to the right which prevents a car from leaving the road on that side, but there is nothing to the left to interfere with one's going off and falling to the bottom of a five or six foot, vertical, dry-rock, retaining wall, and then on down a rocky, rugged, steep incline for twenty-five or thirty feet to level ground, unless stopped by boulders. About half-way down this hillside road, or dugout, as it is referred to throughout the record, and about three hundred yards before reaching the San Carlos bridge, Bernal was injured either through an attack by appellant or as the result of an accident and died within a very short time thereafter. The car in which he and appellant were traveling went off the road at this point, coming to a stop near the bottom of the incline, and the state contends that appellant attacked Bernal, wounding him seriously, then dragged him to the edge of the road and dumped him off, and, to make it appear as though he had been injured in an automobile accident, pushed the car off the road in such a way as to cause it to lodge on or as near his body as possible, while the claim of appellant is that the car accidentally left the road and threw Bernal to the ground, producing the injuries from which he died.

A large number of witnesses were placed on the stand by the state, and the testimony given by them strongly supports its theory of the case, but it, together with that introduced by the appellant, is very voluminous, and the questions raised do not require an account of the occurrence in detail. It appears therefrom that appellant and Bernal reached the dugout around four-thirty P. M., and that about halfway down it their car struck the wall on the right side of the road and stopped, the damage to it being slight, but the noise from the impact was sufficiently loud to attract the attention of Ambrose Comton, an Apache Indian known as I–I, who was working on a wire fence below the road some one hundred fifty yards away. Upon hearing the collision he looked up and saw the car standing against the wall and a truck coming down the road some distance above it in which two white government employees were riding. He testified in substance that after the truck went by the Mexican got out on the right side, walked to the back of the car, and wiped his face with a handkerchief. The man at the wheel then backed the car out into the road and up the grade some distance, got out of it, walked about three steps in front of the radiator, picked up a rock and threw it at the Mexican, but missed him, whereupon the latter ran to the man and threw him down, but after a little scuffling he overcame the Mexican, got on top of him, picked up a large rock near by and beat him in the forehead with it, after which the loud talking or screams that were coming from him were heard no more. He then dragged the body to the edge of the road, placed it in such a position that the head and hands hung over the embankment, took hold of the feet and toppled it over, the place of landing being near the bottom of the incline. Thereupon he drove or pushed the car down the road close to the edge of the retaining wall where

the body was thrown off, but, noticing that Bernal was raising up a little on his hands, left the car, jumped off the retaining wall, went where he was, picked up a big rock and hit him three times in the back of the head, no movement by him being thereafter observed. He then climbed up the incline and retaining wall and pushed the car in such a way that it left the road almost at right angles therewith and landed near the body of Bernal, the right front wheel stopping within a foot or so of his head.

This statement was corroborated in part by two Indian women, Mrs. Horace Newman and Mrs. Ambrose Comton, who testified that they were at their respective tepees that afternoon about four hundred yards away from the dugway, and that, hearing a man in that direction scream or cry, they looked up, saw an automobile standing in the road and a man in front of it dragging something which they at first thought was a dog. He pulled it to the edge of the road, let the hands fall down over the embankment, caught hold of the feet and threw it over, whereupon they realized it was a man and not a dog. After doing this the man went to the car, pushed it to the edge of the road, stopped it, then jumped down to where he had thrown the body, and within a short time climbed to the road again and pushed the car off where he had thrown the man over. They could not see what occurred while he was where the body was because of intervening obstructions; neither did they see anything more of the affair after the car went over the bank, for when that occurred they left their tepees for a neighbor's.

Certain portions of the testimony of I-1 were corroborated by an Indian boy named Ralph Casoose, who lived across the river from the hillside road and a short distance below the steel bridge. He was riding horseback up the river that afternoon, with the intention of going to the east side for a horse,

when he happened to look in the direction of the dugway, it being in clear view, and saw an automobile fall off the road and a white man standing on the highway where it went over. He crossed the river, went up on the road, saw the man working his feet on the ground as though he was shoving dirt with them. Upon his approach the man asked him for help, but it was refused, whereupon the man said, "Did you see me?" The boy told him "No," after which he left the road, remarking as he did so, "My partner got hurt," went on down to where the body was, took hold of deceased's coat and said, "What's the matter Mike?" The witness then asked, "Do you think he is dead?" to which the reply was, "I think he is. I am afraid of that." The boy then rode on and met an automobile coming down the dugway, its sole occupant being a white man, who stopped near appellant after the latter had waved to him to do so.

This person was Zenophon C. Wheeler, a young man twenty-one years of age, who was traveling alone in a Ford touring car from his home in Vermont to California. According to his testimony, he met an Indian boy coming up the dugway on a horse as he was going down, and right afterward saw a man standing in the road farther down staggering around, who waved to him to stop. He came to a standstill some fifteen or twenty feet beyond the man and noticed a car over the embankment, whereupon the man, who gave his name as Blackburn, said he had just had a terrible accident and thought his partner was killed. They both at his request immediately went down to where Bernal was lying on the lower side of the car with his head near the right front wheel, and found that there was a hole in the back of his head that one could almost see through, and that his forehead was all mashed up, though he was still breathing just a little. Both then went up

on the road, and Wheeler tried to get Blackburn to sit in his car, because he was complaining of his head's hurting and a pain in his chest and was pretty badly shaken up and very much out of breath. He did not do so just then, however, but walked up the grade a little, staggering (and "stuffing") around some, and asked Wheeler if he could see any tracks in the road. Without going up where appellant was the witness replied that he could not, and, fearing from the way he was acting that he might faint, told him rather sharply to come and sit in witness' car. He complied this time, and, at his request made immediately thereafter, Wheeler went down again to see if Bernal was dead, and, finding that he was, went back up and drove as close as he could to the body, which he and appellant carried down to the car. Some other tourists came along at this time, and with their help Wheeler placed the body in the rear seat, after which he and appellant left with it for Globe. In explaining the accident, as he termed it, to the witness appellant said they were coming down the hill fast with Bernal driving and ran into the wall on the right side of the road, put on the brakes quickly, and must have skidded the wheels and twisted across the road, for they went over the bank. In reply to Wheeler's question, asked him three times, "where were you when you come to?" he would not answer, but, appearing somewhat dazed and having a slight bruise on the right temple and a little film of blood around the edge of his nostrils, he said he had a terrible nosebleed sitting on top of the retaining wall almost straight up from the car where there was a little puddle of blood.

Dr. Sawyer, agency physician for the Apaches, and one of the men in the truck which passed down the dugway just after the collision, testified that about halfway down it he saw a Ford car standing

right up against the rock wall on the right in which there was a man sitting at the wheel on the left holding his head over it and running his hands through his hair. He did not see another person in the car, though one might have been there without his seeing him. He stated also that a little farther down the hill he saw some Indian women around their tepees on the right side of the road and an Indian called I–1 on the left who was doing a little work around there. The other man in the truck, Theodore Shipley, overseer of Indian labor for the United States Indian Service, corroborated Dr. Sawyer in the main, though he saw two men in the Ford car as they passed at a speed of between eight and twelve miles per hour, and the hand of the one on the right was swinging on that side of the car. As near as he could tell the man at the wheel was a Mexican, though he had no mustache. He saw I–1 on the left of the road two or three hundred feet below the Ford car doing some work, and after crossing the bridge and reaching the railroad he looked over his shoulder to the left and saw the car still standing on the hill and a man in front of or near it.

A nurse at a Globe hospital to which Wheeler took Bernal and Blackburn testified that there was no blood on the latter's face, but that the left side of his coat and sleeve was bloody and both hands had dried blood on them. While washing his hands she asked where he had had them, and he replied that he thought his nose must have bled, and when in answer to this she suggested that he did not have any blood on his face he said that he wiped it on a handkerchief and threw it away. In telling her of the accident he said that all he recalled was falling and lying stunned for quite a while on some rocks.

An autopsy by two physicians disclosed that Bernal's skull had been fractured in several places in front, and that directly back of the left ear there

was a piece of bone probably two and one-half by two inches pressing against and denting into the brain tissue. There were various blood clots, both in the front and the back, extending into the brain tissue.

As bearing on the question of motive, the state introduced evidence showing that between June 12th and the latter part of August, 1925, appellant and Bernal called on seven different life insurance companies and applied for insurance on the life of the latter, appellant doing the talking in each instance and paying all the premiums, amounting to more than $2,000. Ten policies were issued by six of these companies for the total sum of $55,000, all of them, except two for $5,000 each, carrying the double indemnity clause. In one of the policies Blackburn was made the beneficiary, but in the other nine Bernal's estate was so named, though by the latter part of October, a few days before the trip to Safford, appellant had become the interested party in all these, either through an assignment of the policy or a change in its beneficiary, and thereupon the amount recoverable by him in case of the accidental death of Bernal was $100,000. One company refused an application for $10,000 upon the ground that it had been informed that Bernal had already applied for at least $10,000 additional insurance, and it questioned if he was not overinsured for one in his position.

Appellant's explanation of the large amount of insurance held by him on Bernal's life was the fact that they were business partners in the operation of his farm and dairy in which undertaking he had advanced Bernal money, and, further, that he had sold Bernal a two-thirds interest in a mine in Pinal county for $40,000 and taken two notes signed by him for $20,000 each as a sole consideration therefor, it being admitted that nothing was paid thereon

at the time of the sale or afterwards. The only evidence on the value of the mine was that of appellant himself, who considered it worth that much money.

Appellant testified that Bernal's death was the result of an accident which he described substantially as he did to the witness Wheeler. The last thing he remembered before the accident, he stated, was crashing into the bank on the right and being struck by something on the temple, and the next thing was pulling himself out from the car which was over the bank and hearing someone "hollering," "Help, Charlie! Help!" He was dazed and could not understand what was going on but soon turned, saw Bernal's body lying under the right wheel, and tried to release him, but was unable to do so because the car, which was right side up, would go toward him as he hunched the wheel around and he was afraid it would turn over on Bernal. He then went up on the road looking for someone to come along, and his nose was bleeding, so he sat on the bank and let it bleed on the rocks. After a short time he went back to Bernal and tried again to release him, but was unsuccessful because the car was resting in such a position that the more he tried to move it the more apt he was to turn it over on Bernal. He went to the road again thinking someone would come along and saw an Indian coming up the grade on horseback, to whom he beckoned for help but was refused. Just at this time Wheeler came down the road in his car, and appellant stopped him telling him of the accident and asked him to help him get his partner out. His testimony from then on is substantially the same as Wheeler's, though he said that Bernal was not dead and he urged haste in getting him to a doctor.

Much of the evidence in behalf of the defense was directed toward showing by engineers and others

that I–l and the two Indian women could not on account of obstructions—bushes of some kind—have seen what they testified to; that it was impossible to push a car over the wall as described by them; and that there was no matted hair in the blood on the rock wall when examined some days after the occurrence.

Other facts that may be necessary will be given when discussing the particular error to which they pertain.

A reversal of the judgment is sought upon the ground that the court erred in giving three instructions and in overruling appellant's motion for a new trial based upon the instructions and six other errors. Assignment No. 1 complains of the following instruction:

"The defendant has offered himself as a witness in his own behalf. He has that right, and you should consider his testimony as you would that of any other witness, weighing it and judging of its credibility by the same rules governing the testimony of witnesses generally. That is, in determining the credibility and the weight you should give to his testimony, you have a right to take into consideration, as you do any other witness, his manner and appearance while testifying, his means of knowledge, and any interest or motive that he may have, if shown, and the probability or improbability of the truth of his statements when taken into consideration with the other evidence in the case."

The objection is to that portion of the instruction pointing out that in determining the credibility and weight to be given the defendant's testimony the jury has a right to take into consideration, among other things, "any interest or motive" he may have, because in effect it advises the jury that his interest in the outcome of the case is so great that his testimony is entitled to little, if any weight, and amounts to a "charge with respect to matters of facts," to

wit, "the weight and credibility to be given his testimony." In support of this view *Erickson* v. *State*, 14 Ariz. 253, 127 Pac. 754, is cited, and a reading of the opinion in that case discloses that the court did say that an instruction dealing wholly with the defendant's testimony and stating, "but you are at liberty to consider the very great interest which he has in the result of your verdict," was error, because it violated section 12, article 6, Constitution of Arizona, providing that "judges shall not charge juries with respect to matters of facts nor comment thereon, but shall declare the law." But the court did not stop with this statement; it said further that it did "not want to be understood as announcing that such instruction would be considered as sufficient ground in every case for reversing the judgment; for the above provision of the Constitution must be construed in connection with section 22, article 6, of the Constitution, which provides that: 'No cause shall be reversed for technical error in pleading or proceedings when upon the whole case it shall appear that substantial justice has been done.'" Hence, it is only a question whether, in view of the entire record, the instruction is prejudicial or amounts merely to harmless error within the meaning of this section.

This instruction does not say, as the one in the Erickson case did, that appellant had any interest, great or small, in the result of the verdict, nor that the jury should give credit in any degree to his testimony, but merely mentions the interest or motive he may have, if shown, as one of several guides the jury might use in determining the credibility to be attached to his testimony, giving no more prominence to this particular one than to the others. Its wording is such that one does not gain the impression from reading it that the court is stressing the defendant's interest or motive, but is rather informing the jury

that it should judge his testimony by the rules applicable to the testimony of witnesses generally, his interest or motive being given merely as one of these. It places his testimony in this as in all other respects upon the same basis as the testimony of all other witnesses. If a comment at all on the weight and credibility to be given defendant's testimony—the fact with respect to which appellant claims it is a charge—it is not so to any greater extent than necessary to enable the court to discharge its function in this respect, namely, give the jury the rules by which it should be guided in determining this fact.

However, the court had fully performed its duty in this respect in the preceding paragraph when it gave an instruction governing the credibility of witnesses generally which applied to the defendant the same as to any other witness, thus rendering the repetition of it with particular reference to the testimony of him or any other witness wholly unnecessary and in fact objectionable. The principle involved in the instruction should have been given in general terms only, and the jurors permitted to apply it to the testimony of all witnesses without any suggestion from the court as to its applicability to the testimony of any particular one. While they, as sensible men, would undoubtedly have done what it advised anyway, yet "the danger of such practice," said the court in *People* v. *Bartol,* 24 Cal. App. 659, 142 Pac. 510, "lies in the possibility that the jury may infer that the judge of the court intends to discredit the testimony of the defendant." It was therefore error to give the instruction, but after a review of the entire record it is clear that it should be disregarded, because the evidence in the case amply supports the verdict and shows that it could not have been prejudicial. It was merely a technical error of procedure within the meaning of section 22, article 6, *supra,* and there is no reason to believe

the jury would have taken a different view of the evidence if the instruction had not been given or reached a different result.

In support of his contention appellant cites *People* v. *Maughs*, 149 Cal. 253, 86 Pac. 187, in which the Supreme Court of California held the giving of such an instruction reversible error. However, after the adoption by that state of a constitutional amendment, practically the same in meaning as section 22, article 6, *supra,* it was held in *People* v. *Bartol, supra,* that an instruction telling the jury that it was proper for it "to consider whether the position and interest of such defendant may not affect her credibility and color her testimony" constituted only harmless error, and we are clearly of the view that this instruction is no more objectionable than that.

The objection to the next instruction is also based upon the ground that it is a "charge with respect to matters of facts." It is in the following language:

"You are instructed that, as a general rule of evidence, affirmative testimony is regarded as stronger than negative; in other words, the rule is that the testimony of a credible witness that he saw or heard a particular thing at a particular time and place is regarded as more reliable than that of any equally credible witness with the same opportunity who testified that he did not hear or see the same thing at the same time or place. The reason for this rule is that the witness who testifies to a negative may have forgotten what actually occurred, while it is impossible to remember what never existed.

"You are instructed that positive testimony of a small number of witnesses that they saw or heard a given thing occur, will outweigh the negative testimony of a greater number of witnesses that they did not hear or see it, provided the witnesses are equally credible; but in connection with this instruction should be considered the relative means or opportunity of the several witnesses to see or hear the occurrence, and it should be carefully kept in mind that it only

applies when the witnesses are equally credible. You understand what is meant by positive and negative testimony. For instance, if four of you men are walking down the street and a car crashes over the sidewalk, goes over the sidewalk into a store front, one of you would see that but three don't see it. The one who would testify he saw it, his testimony would be positive; those who would testify they didn't see it would give negative testimony. That is an illustration of what is meant by positive and negative testimony.''

It is a rule of evidence deduced from the experience of mankind and supported by reason and authority that positive testimony is entitled to more weight than negative testimony, but by the latter term is meant negative testimony in its true sense and not positive evidence of a negative, because testimony in support of a negative may be as positive as that in support of an affirmative. The distinction between the two classes of testimony sufficiently appears from this instruction, but notwithstanding the correct statement therein of the general rule, it constitutes a ''charge with respect to matters of facts,'' and, if there is any material evidence in the record to which it applies, should not have been given, because the weight to be attached to the testimony of any witness, whether it be positive or negative, is exclusively for the jury, and in the discharge of this function it should be free and unhampered by any suggestion from the court. Such is the law in those jurisdictions in which a comment on the facts is prohibited (Blashfield's Instructions to Juries, § 337), and this court so held in *Babb* v. *State*, 18 Ariz. 505, Ann. Cas. 1918B 925, 163 Pac. 259, that case being the first to present the question after the adoption of the constitutional provision prohibiting a comment on the facts, and it is upon that decision that appellant chiefly relies to sustain this assignment of error.

Appellant claims there is material negative evidence in the record, and to sustain his position points chiefly to the testimony of I. A. Jennings, one of his attorneys, who went to the dugway on the morning of November 8th to find out what he could about the occurrence and remained there for two hours looking over the ground. After examining the blood spot down in the cluster of rocks below the bank and seeing quite a bit of hair there, he investigated very thoroughly the blood spot on the dry wall, and at the trial testified as follows concerning it:

Direct examination:

"Q. Did you see any hair on that blood spot, or on that dry wall at all? A. I did not.

"Q. Can you say whether there was any hair there at that time? A. I can state this, that I made a very thorough examination of the blood spot on the wall, and if any hair had been there I would have seen it, and I did not see any."

Cross-examination:

"Q. So if there was any hair congealed in that blood on the 8th when Seth Dodge and Mr. Udall and Mr. Edwards looked at it, somebody put it there after you left? A. I don't know; it wasn't there when I was there."

In contending that this is negative testimony the defendant calls our attention only to that given on direct examination, but this position would not be tenable if there were nothing further on the subject. While, it is true, the witness did not then say in exact words that there was no hair in this blood spot, he did state that if there had been any there he would have seen it and that he did not see any. Under the authorities such an assertion is much more positive than the mere negative statement that he saw no hair in the blood spot when made by one who was in a position to know the fact and whose attention was directed to it. The witness was at the

scene of the occurrence for a long period of time for the specific purpose of making a thorough examination of the locality and did so under circumstances that gave him every opportunity to do this, and, after observing hair in the blood spot below the bank, directed his attention specifically to ascertaining if there was any in the blood spot on the wall. "If it was the duty of the inspector on the part of the railroad company to inspect those cars," said the court in *United States* v. *Baltimore & O. R. Co.* (D. C.), 170 Fed. 456, "and he says that he did inspect the cars that came in there and did not see this defective appliance, that is not, . . . such negative testimony that it should not receive the same consideration, other things being equal between the witnesses, as positive testimony." *Brown* v. *Milwaukee Electric Ry. & Light Co.*, 148 Wis. 98, 133 N. W. 589; *Whittaker* v. *New York & Harlem R. R. Co.*, 51 N. Y. Super. Ct. 287; *Ft. Smith & W. R. Co.* v. *Messek,* 96 Ark. 243, 131 S. W. 686, 966; *Morgan* v. *Iowa Cent. Ry. Co.*, 151 Iowa 211, 130 N. W. 1058; *Lonis* v. *Lake Shore & M. S. Ry. Co.*, 111 Mich. 458, 69 N. W. 642.

However, if there were any question as to the character of the statement on direct examination, there is certainly none when the assertion on cross-examination, that "it wasn't there when I was there," is considered in connection therewith. Evidence, though of a negative fact, could be no more positive than this. As said by the court in *State* v. *Kellogg,* 91 Wash. 665, 158 Pac. 344:

"Where a witness swears that a particular act occurred at a specified time and place, or that particular language was spoken by a person to whom he refers, this is affirmative evidence. But, if another witness were at the same place at the same time, and were to swear that he did not observe the act or hear the language of which the other speaks, this would be called 'negative evidence.' If, however, the

latter witness were to state that his attention was fully attracted to what occurred and what was said, and that the act of which the other spoke did not occur, or that the language was not used by the person to whom it was attributed, this would be fully as affirmative as the other.''

The jury could not under the instruction have treated this testimony as negative any more than it did that of the two other equally credible witnesses who were at the dugway in the afternoon of the same day and testified that they found hair in the blood spot on the wall. The evidence of all three witnesses was positive, and the jury's right to weigh it and give credit in accordance with its view of its credibility was unaffected by the instruction. So far as it referred to this testimony, it was a mere abstract statement of a legal proposition without application or effect, and is presumed to have resulted in no harm to the defendant. 17 C. J. 342; *People* v. *Vaughn,* 14 Cal. App. 201, 111 Pac. 620; *State* v. *Chappell,* 179 Mo. 324, 78 S. W. 585.

The statement of the witness Zenophon C. Wheeler that he did not notice any blood in the road there, and of the witness George B. Sissons that he did not know of any blood between the bank and the big pool of blood in the cluster of rocks, are also mentioned as instances of negative evidence. Neither of these witnesses, however, paid any attention to blood at these places, for they were interested in other phases of the occurrence. The former thought the machine's going off the bank was an accident, and stated that he did not look around in the road on top of the bank to see if blood was there, and the latter, who thought the same thing, testified that he did not examine closely as to blood, but was principally interested in knowing how the car got off the bank the way it did. The testimony of both witnesses was negative, but it is so palpably plain that it was

under the circumstances of but little weight that the instruction, though technically erroneous as to it, was harmless.

E. E. Kunselman, a photographer, testified that he stood where I-1 was supposed to have stood and placed a man at the point below the dry wall and in the position that I-1 claimed Bernal was and he (Kunselman) was unable to see the latter, because two bushes in the line of vision obstructed his view. And James M. Brown, an engineer, testified that he tried to push a car over an embankment in Phoenix approximately like the one at the dugway and was unable to do so. These statements are also pointed to as negative testimony, but it is very clear that they are positive in character and that their only effect was to aid in proving that certain facts sworn to by I-1 and the two Indian women were not true. The fact that it helps to establish the negative of a proposition does not make it negative testimony within the meaning of this term.

The third instruction objected to and which forms the basis of the next assignment of error is in the following language:

"The jury was instructed that, if you should find that there are discrepancies or inconsistencies existing in the testimony of any witness, or between the testimony of any witnesses, or if you should find yourselves disagreeing over various issues, real or apparent, you should then ascertain whether or not such discrepancies or inconsistencies, or such points of difference, affect the main issue in this case. Examine such discrepancies or inconsistencies and such disputed points, look at the same squarely, and ask yourselves these questions: How does the decision of this, or that, or the other discrepancy, or matter in dispute, affect the main issue in this case? Is such discrepancy or such disputed point material to establish the main and material fact? If they are not material, if the decision of the same is not necessary to enable you to arrive at the truth of

this main issue, then such disputed points are immaterial and minor matters, and do not waste further time in discussing or considering them. Spend no time in the discussion of minor matters which, whether true or false, do not affect and are not necessary to enable you to answer the important question, Is the defendant guilty as charged in the information, which is the issue which you are to try in this case?''

We are unable to find any basis for the contention that this is a charge with respect to matters of fact. It was not only unobjectionable, but clearly proper to give it under the circumstances. The trial had continued through a period of nine or ten days, the testimony introduced being voluminous, and it was inevitable that many inconsistencies and discrepancies would arise therein. Hence, it was a wise precaution to advise the jury to examine these with reference to their bearing on the real issue, the guilt or innocence of the accused, and to waste no time on them when it was found that they were immaterial. An instruction almost identical in language, certainly the same in meaning, was given in *State* v. *Wappenstein,* 67 Wash. 502, 121 Pac. 989, a prosecution of the chief of police of the city of Seattle for bribery, and, notwithstanding a constitutional provision very similar to section 12, article 6, *supra,* the court upheld it, the ground given for its action being so clearly correct that it is unnecessary to do more than repeat its language:

''It is argued that this instruction tended to eliminate from the consideration of the jury many disputed and material facts. We think not. The purpose of the instruction was plain. It was a mere caution to the jury against being led afield and unduly influenced by discrepancies or inconsistencies which had no bearing upon the main issue in the case, namely, the guilt or innocence of the defendant. They were instructed to examine each discrepancy with that issue in view. The testimony in this case

is very voluminous. In such a case, there is always danger of the jury becoming hopelessly involved in a maize of collateral issues. A caution to examine every discrepancy, inconsistency, and disputed point with a view only to its bearing upon the real issue, and to waste no time upon any such matter when found immaterial to that issue, was entirely proper. It took no fact from the jury. The jury was told to examine every such discrepancy or inconsistency till it was found immaterial. In prior instructions the court had clearly defined the issue. In a subsequent instruction the jurymen were told that they were the exclusive judges of the evidence, of the credibility of the witnesses and of the degree of weight to be attached to their testimony, and to give to the testimony of every witness just such weight or value as they might think it entitled to. The instruction complained of, taken in connection with the others given, was not objectionable.''

The denial of the motion for a new trial furnishes the basis for the fourth assignment of error. A new trial was sought upon seven distinct grounds, the first one being the giving of the foregoing instructions. The second was the allegation that the jury received evidence in the absence of the defendant, his counsel, the judge, the clerk and the reporter without his consent. It appears that during the trial the Ford car in which the defendant and Bernal were riding on November 4th was near the courthouse in possession of the sheriff. Much evidence had been introduced by both sides concerning it, and as the state was finishing its case the prosecuting attorney, asked that the jury be permitted to examine it, and requested a few minutes' recess to check over the evidence. The court replied: ''Very well, they may do that. We will take our recess.'' Thereupon the people were asked to retire from the courtroom and also the grounds so there would be nothing to interfere with the inspection, but told that if they wanted to see the car they would have to see the

sheriff privately afterward and get a look at it, because "we are going to exhibit it to the jury and not to the general public. We can't have a crowd down there around the jury as we go down to see it, so we will take a few minutes' recess." It appears from the showing in support of the motion for a new trial that during the recess and in the custody and presence of four bailiffs and the sheriff who thought, though mistakenly, that the foregoing authorized an inspection, the jury examined the car, it being rolled out of the garage into an open space about twenty-five yards from the courthouse; that while the inspection was being made no word was spoken by the sheriff, the bailiffs or any juror, no one else being present; that near the close of the inspection the attention of the chief counsel for the defendant, the judge and the reporter was directed to the fact that the jury was inspecting the car, it being at the time in clear view from the judge's chambers where they were; and that nothing was said about the matter until the motion for a new trial was filed.

Just why an objection to the jury's action was not presented immediately following this recess and the court asked to correct whatever error had been made, even to the extent of discharging the jury, if necessary, does not appear. It was the defendant's duty to act then and not wait until the trial was over if he felt that he had been prejudiced thereby, and the fact that he did not do so indicates that he thought no harm had resulted. This appears more clearly to be true when it is remembered that within a few minutes after the recess the court ordered the jury to view the place where the alleged offense occurred, a request to this effect having theretofore been made, and the defendant, instead of insisting on being at the view, specifically waived his presence there in open court. Whether he felt such a waiver

made at that particular time included a waiver of his presence at the view of the car upon the theory that the car was a part of the premises where the alleged offense occurred, and, though afterwards removed from that locality, was too bulky to be produced in court and viewed therein, is not indicated. But whether this be the reason or not the court had the power to order a view of the premises (section 1061, Penal Code 1913), and, such a proceeding being treated in this jurisdiction as a suspension of the trial and not as a continuation thereof for the purpose of taking evidence, the defendant had a right to waive his presence at the place it was being had. Such was the holding of the court in *Elias* v. *Territory*, 9 Ariz. 1, 11 Ann. Cas. 1153, 76 Pac. 605. An inspection of the car. was a proceeding virtually the same in character, the defendant and the respondent both relying on those cases dealing with the defendant's absence from the view as being in point.

However, even though it be conceded that he did not waive his presence, the fact that he was absent did not constitute reversible error unless his rights were prejudiced thereby, and in the report of what transpired at the inspection itself there is nothing from which prejudice can be inferred. While it was error for the jury to make the inspection in the absence of the defendant whose presence had not been waived, or without the sheriff's being specially sworn beforehand, it was, under the circumstances, harmless and furnishes no basis whatever for a reversal. Prejudice will not be presumed under such circumstances, but must be made to appear before the court would be justified in reversing because of it. *Lawrence* v. *State*, 29 Ariz. 247, 240 Pac. 863.

It is next claimed that it was error to deny a new trial upon the ground that during the trial the court made certain improper remarks which were prejudicial to the rights of the defendant. Four separate

statements of the court are pointed out as a basis for this assignment, but we have examined them carefully, and, while they were uncalled for and should not have been made, it is inconceivable that any or all of them together could be regarded as constituting prejudicial error; for instance, the last one which comes nearer to it by far than any of the others was brought about by the fact that during the cross-examination of the defendant and about twenty-five minutes before closing time on Saturday afternoon, the case having been continually before the court for about a week, the prosecuting attorney asked for a continuance, and in ruling upon this request the following took place:

"The Court: . . . Now, as for the continuance or adjournment at this time, the burden has been upon two counsel. The burden of the defense has been upon four, and at least you have divided your work in examining the witnesses, and I will say this, that it is pretty hard for a couple of young fellows to handle a proposition and have two old men at the game jumping them all the time, and I feel like, while they are entitled to no particular consideration, yet I feel like they possibly are entitled to some.

"Mr. Struckmeyer: If your honor, please, your honor has a right to exercise his judgment, but I don't think the remark that we tried to jump on them—

"The Court: I don't mean you are trying to jump on them, but you are up and going all the time and ready to catch them at any time they make a mistake."

Counsel for the state and the defendant had had some rather heated discussion, and the court told the jury to pay no attention to the "bad remarks" of counsel on either side, but to listen to the evidence and consider it and the arguments when made. Then the remarks complained of followed. It is very evident, however, that they were aside from the merits of the case and were of such a nature that no jury

of reasonable men could have been influenced in the least thereby. In addition to this, if it were possible that a wrong impression were given by them, or the other remarks complained of, the court cured it by instructing the jury specifically to give no weight whatever to remarks made by the court during the trial but to be guided solely by the law contained in the instructions he was then giving.

It is next claimed that this assignment is good because of the prejudicial remarks of the county attorney and the special prosecutor during their arguments to the jury. Their remarks were so nearly the same that they can be disposed of together. The county attorney told the jury in effect that he had worked hard on the case, had made every effort to find out the facts both for and against the defendant, and had been unable to find any in his favor. The special prosecutor said the same in substance and added:

"I have put my whole soul into it, and I have just as firm a conviction that this defendant is guilty as charged in this case as I have that I am standing before you gentlemen, and you know me well enough to know that I would not stand up here before you and deliberately urge you to do the thing that I am going to ask you to do in this case unless I myself believe that was the thing to do."

Each statement was little, if any, more than the expression of the very firm conviction of the counsel speaking that the defendant was guilty, and was undoubtedly based upon the evidence, for there is no intimation that facts not before the jury entered into them. If the attorney for the state were of the view that the facts warranted it, he was at liberty in argument to draw the inference of guilt from them just as the attorney for the defendant could draw that of innocence. It was merely the argument of counsel whose conclusions from the facts were un-

doubtedly accepted by the jury only so far as it was convinced of their correctness. The special prosecutor was rather overzealous in expressing his opinion, but not to the extent that his remarks constitute prejudicial error. Whatever objection or impropriety may have been attached to them was removed by the admonition of the court at the time and later in his instructions to disregard them and decide the defendant's guilt or innocence solely from the facts in the case, and as reasonable men possessed of ordinary good sense they could not have been led to do otherwise by them. "If the objectionable remark could, in itself, have been capable of any possible influence against a fair and impartial trial," said this court regarding derogatory remarks of the county attorney in *Gibson* v. *Territory,* 8 Ariz. 42, 68 Pac. 540, "its effect must have been entirely neutralized by the action of the court in reproving counsel for the expression, and directing the jury not to consider it. We cannot any more assume that the jury disregarded this instruction than we could assume that it considered evidence which had been ordered stricken out." See, also, *Midkiff* v. *State,* 29 Ariz. 523, 243 Pac. 601.

The last proposition advanced by the defendant as showing that the order denying a new trial was erroneous is disposed of by what we have said in the preceding paragraph. It grows out of improper remarks of special counsel for the state made during the argument of defendant's counsel, F. C. Struckmeyer. Certain witnesses had testified that Bernal was beaten over the head with a rock upon the road, then dragged to the dry wall and left with his head lying there while the defendant went to his feet, took hold of them, and dumped him off. There was blood on the dry wall which the state claimed came from Bernal's wounds, but the witness Wheeler testified that he saw no blood on the road except that on the

dry wall, and there was no evidence to the contrary. While defendant's counsel was arguing to the jury that Bernal could not have been treated in this manner without blood's being left along this pathway, counsel for the state interrupted him and said in the presence and hearing of the jury that the state had during the trial and while the jury was absent offered to prove that there was blood on the road where the body had been dragged, but because of the objection of defendant's counsel the court had refused to admit it. The court thereupon directed the jury to pay no attention whatever to the remarks of the special prosecutor, but to decide the case upon the evidence introduced, and, in addition and just a little later, used the following language in his instructions:

"Now, in this case, any statements of counsel as to what they expect to prove, or offer to prove, or any attempt to prove a fact the proof of which is not admitted by the court, or which has been ordered stricken from the record by the court, must be entirely disregarded and dismissed from your minds, and it must in no wise affect your verdict."

The remarks of counsel were improper and objectionable and should not have been made, but in view of the prompt action of the court directing the jury to disregard them and the voluminous evidence in the case strongly supporting the verdict, this court cannot say that it had any prejudicial effect.

Neither this nor any of the other errors raised are more than harmless when viewed in the light of the whole record. If the sufficiency of the evidence to support the verdict were open to question it might perhaps be plausibly argued that they contributed in some small degree thereto, but where the testimony is so strong as it is here it is inconceivable that they could have had. any harmful or prejudicial effect. Had there been placed before the jury only the evi-

dence of what took place at the dugway and subsequently its verdict would have been amply sustained by the testimony, because the fact that Sawyer and Shipley rode by the defendant and the deceased sitting in their car just after it had run into the bank and come to a standstill disproves conclusively the contention that Bernal's death was the result of an accident, it being impossible that the driver could "have skidded the wheels and twisted across the road" after his car had stopped, or that there could have been a blood spot on top of the dry wall with hair in it. And when, in addition to this, it is remembered that Bernal, an ordinary Mexican laborer, was through the efforts of the defendant, carrying $55,000 insurance upon his life, the policies for which had been applied for and secured within a few months after he began working for the defendant, that at the time of Bernal's death the defendant had become the beneficiary in all these policies, the change to him in the last one having been made just a few days prior to the trip to Safford, and that, because of the double indemnity clause in all of them, except two for $5,000 each, the defendant would have received $100,000 in case of the accidental death of Bernal, the conclusion that the killing of Bernal was felonious, deliberate, premeditated and with malice aforethought comes with such impelling force that this court is clearly of the view that the verdict would have been the same had none of the alleged errors occurred.

It appearing upon the whole case that substantial justice has been done, the cause should not be reversed. The judgment is therefore affirmed.

ROSS, C. J., and LOCKWOOD, J., concur.