CONTINENTAL CASUALTY COMPANY, APPELLANT, *v.* LoLETA GARDNER, RESPONDENT.

No. 4447

April 20, 1962 370 P.2d 957

*Vargas, Dillon & Bartlett* and *Alex. A. Garroway,* of Reno, for Appellant.

*Ernest S. Brown* and *Jack I. McAuliffe,* of Reno, for Respondent.

## OPINION

By the Court, BADT, C. J.:

The question presented by this appeal is whether a judgment in favor of deceased's widow, based on an

insurance policy conditioning the payment of the death benefit upon "bodily injury caused by accident * * * resulting directly and *independently of all other causes,"* finds substantial support in the evidence.

We have italicized the words on which defendant based its defense and under which it asserts that it is entitled to a reversal under the evidence adduced.

Plaintiff's husband was 38 years old, of good health, six feet two inches tall, and weighed between 225 and 250 pounds. He had been an excellent driver for many years and had never been involved in an automobile accident or cited for a driving violation. On the morning of the accident his car was in good condition, and he was in good spirits. He was driving along a highway in the town of Loyalton, California, at a speed of about 10 to 15 miles an hour. As he approached an intersection where one Lola Gilmer was stopped at a boulevard stop sign, waiting for him to pass, he tooted his horn twice as he looked toward her and motioned to her with one hand to come to him. She thought that he was seeking directions. As he got in front of her, he pressed down hard on the horn and started "tooting steady." Then he straightened up and "looked sort of to the side and a little bit back" at an odd angle as if he was looking in the rear-view mirror. He speeded up to 50 or 60 miles an hour. She followed him down the highway about a fifth of a mile to a point where, failing to make a gradual right turn, he continued straight ahead, off the road, over a ditch, knocked down a fence, bounced through a yard, and collided with a house.

The foregoing reflects Mrs. Gilmer's testimony. Just before he left the highway, a Mrs. Vallery saw him go past her "at a real terrific speed * * * just like a bullet out of a gun." She then saw his car collide with the fence and then the house.

Dr. Vasco A. Salvadorini was called as an expert witness for plaintiff. He had performed an autopsy on the deceased shortly after the accident. The report thereof is an extended and detailed document occupying three pages of single-spaced typewriting and concludes:

"Cause of death: Contusion and subarachnoid hemorrhage of the brain due to extensive depressed fracture of the skull with multiple fractures and contusions of the body due to trauma."

Dr. Peter Rowe was called as an expert by defendant. The testimony of the eye witnesses was read to him, as well as the testimony that deceased was a careful driver, continuously engaged in business requiring him to be on the highway almost every day and for long distances, and always kept his car in excellent condition. He was then asked if he had an opinion "as to what might have occurred at or immediately prior to [deceased's] impact with the house which would result in behavior such as these witnesses have described on the highway." He answered: "Yes, in my opinion something went wrong with this man at the time he passed in front of the car or stopped at the boulevard stop.

\* \* \* \* \*

"Now I cannot explain the erratic course of an automobile driven by a careful driver, other than by assuming something happened to this man at the time he passed the boulevard stop, and the inferential material that we have certainly makes spontaneous subarachnoid hemorrhage likely, a likely explanation for this."

It is true that he subsequently referred to some of the facts appearing in the autopsy report and some of the facts testified to by Dr. Salvadorini as affording some support to this possibility, but it is manifest that the testimony just quoted to the effect that the erratic course of the driver cannot be explained other than by assuming that something happened to him at the time he passed the boulevard stop could have been given by anybody (expert in any field or expert in no field) to whom the testimony of the eye witnesses had been read. It is true that Dr. Rowe testified to a possible spontaneous subarachnoid hemorrhage and that he also indicated the possibility of a saccular aneurysm. Remembering that Dr. Rowe had never seen the body of the deceased, we turn to the testimony of Dr. Salvadorini in rebuttal. "Q. Did you examine this man's heart? A.

Yes, sir. Q. Did you find any evidence of any disease or anything abnormal with reference to the heart? A. Well, I found no significant heart disease. He had slight arteriosclerosis of the coronary vessels. He had a few small hemorrhages in the inner surfaces of the heart, such as you see in injuries of this type. Q. But, in your opinion, would any heart trouble have contributed to the death? A. I found no anatomical or histologic evidence of this. Q. Did you find any evidence of any severe illness in this man? A. I found no organic diseases, as such. Q. In your opinion, was there anything the matter with this man which could have contributed to his death? A. I found no anatomical or histologic evidence of any underlying disease."

On cross-examination he testified as follows: "Q. What do we mean by 'saccular aneurysm?' A. It is a little dilation. Oh, when you have blown up some tire inner tubes, and all of a sudden they puff out in one place, that is what I would call a saccular [aneurysm]."

Later on in the cross-examination we find the following: "A. Are you asking me if he had a saccular aneurysm? Q. In other words, if he had such— A. He didn't have one. Q. Well, how do you know he didn't? A. Because I examined him. Q. Well, could you have told definitely that he did not have a subarachnoid hemorrhage prior to the impact of his head at the time the automobile struck that house? A. He did not have one. Q. How do you know that? A. I examined the vessels, looked for it."

There was further extensive cross-examination, including questions as to the possibility of the occurrence of a spontaneous subarachnoid hemorrhage, or a hemorrhage from a saccular aneurysm before the car ran off the road. The doctor's positive testimony adequately disposed of such possibilities. As to the possibility of the existence of a saccular aneurysm resulting from a congenital defect, Dr. Rowe accepted Dr. Salvadorini's testimony as to the absence of any such defect.

We have heretofore referred to parts of Dr. Rowe's testimony in the nature of expert testimony: "With an intracranial hemorrhage, a spontaneous subarachnoid

hemorrhage, the characteristic thing that occurs is an extended position of the body, with the head thrown back. This is stiff and unyielding. One can't move these people. Q. You say it would be stiff? A. It is. Q. It is stiff? A. There is a certain amount of information in the autopsy report that makes this likelihood more than chance. This was an obese man. Q. What do you mean by 'obese?' A. He was fat. Dr. Salvadorini's written report contains evidence, or contains the statement that he had moderate hypertrophy of the muscle of the heart. Q. Tell us what you mean by that. A. Well, I don't mean differently than Dr. Salvadorini."

But Dr. Rowe's testimony as to the deceased's obesity was a misconception of his height as 62 inches. His actual height was six feet two inches, which gives a far different picture of obesity or lack of obesity. In like manner, when discussing the possibility of the occurrence of spontaneous subarachnoid hemorrhage, in the absence of injury, Dr. Rowe concedes that such a possibility would be limited to five to ten percent of the cases, and would characteristically be evidenced by headaches or other discomfort, all of which were absent in this case. He also admitted that his testimony of the likelihood of such hemorrhage in the absence of injury was based upon the deceased's bodily overweight and abnormal state of obesity. This, as we have indicated, was not justified by the facts, although it might indeed have been so concluded from faulty punctuation in the autopsy report. A man weighing about 230 pounds might indeed be considered obese if he were five feet two inches tall, but not necessarily if he were six feet two inches tall.

Appellant contends that Dr. Salvadorini's testimony was all negative and not entitled to the weight given to positive testimony. We do not consider his testimony in that light. It is positive testimony that certain conditions did not exist.

In Blackburn v. State, 31 Ariz. 427, 442, 254 P. 467, 472, the court, after recognizing the rule that positive testimony is entitled to more weight than negative testimony, said: "* * * but by the latter term is meant

negative testimony in its true sense and not positive evidence of a negative, because testimony in support of a negative may be as positive as that in support of an affirmative." Such is the case here.

Respondent does not deny the proposition that if deceased had lost control of himself and of his car by reason of a sudden heart attack, stroke or other pre-existing disabling condition, the terms of the policy would preclude recovery. Nor does appellant contend that it may escape payment if the death resulted directly from the accident independently of any prior or pre-existing heart attack, stroke or other disabling condition. Respondent first met her burden of proving her husband's accidental death. Appellant then sought, through the testimony of the two eye witnesses and Dr. Rowe, to prove that an independent cause, a pre-existing physical disease, contributed to the death. Respondent met this challenge by the positive testimony of Dr. Salvadorini.

Appellant in urging a reversal relies on language quoted from a number of opinions. The cases cited however are clearly distinguishable. In virtually all such cases it clearly appeared that the plaintiff had a pre-existing disease or disability that contributed to the injury.

Appellant contends that physical facts and the laws of nature cannot be refuted by testimony, and that the physical facts in this case show conclusively that the erratic driving of the car compels the conclusion reached by Dr. Rowe. Conceding the premises, the conclusion does not follow. In New York Life Insurance Co. v. Doerksen, 10 Cir., 64 F.2d 240, on which appellant relies, the court on the second trial, 10 Cir., 75 F.2d 96, 99, said: "Since a car in good mechanical condition does not ordinarily leave a level highway in broad daylight if driven by one in full possession of his faculties, a jury might well conclude from these facts that the accident was caused by some untoward incident, such as a wasp or a bee, the lighting of a cigar or the sudden appearance of a calf or chicken in the road, distracting the attention of the driver." Many other distractions could occur—the

adjusting of a clock, the tuning of a radio, the inspection of a road map (Mrs. Gilmer thought the deceased was seeking road directions), that he was trying to release a stuck accelerator, or other activity.

All the elements discussed—the testimony of the two eye witnesses, the conclusions of Dr. Rowe, the positive testimony of Dr. Salvadorini, the report of the autopsy, the absence of any existing physical or mental disease— lead to the conclusion that a factual issue was presented to the jury, whether the decedent's death was the result of bodily injury caused by accident resulting directly and independently of all other causes. The jury's verdict finds substantial support in the evidence.

Appellant urges further that if deceased was in possession of his physical health and mental qualities, we must assume that he knowingly drove off the highway at the curve with knowledge of the damage that would result, and that such result was therefore not an accident but occurred because he was deliberately violating the law, and a recovery would be against public policy. It also contends that such a deliberate driving of the car off the highway was outside the scope of his employment, in which case recovery would be barred by a clause in the policy. We find no merit in either of these contentions.

Affirmed.

McNamee, and Thompson, JJ., concur.