[Crim. No. 3541. Third Dist. Nov. 18, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. LOBISS PARKS et al., Defendants and Appellants.

Lobiss Parks, in pro. per., and W. Jackson Willoughby III, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Doris H. Maier, Assistant Attorney General, and Roger E. Venturi, Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, P. J.—Appellants Lobiss Parks and James Williams were convicted of three offenses: violation of Penal Code section 475 (possession of uncompleted money orders with intent to defraud), violation of Penal Code section 475a (possession of a completed money order with similar intent), and of conspiracy to violate Vehicle Code section 4462 (use of a license plate upon an automobile for which it was not issued). Their appeals from the judgment following conviction raise the contentions that (1) evidence, the product

of an illegal search, was improperly admitted in evidence; (2) that Williams was improperly denied a continuance of trial for the purpose of obtaining private counsel of his own choice; (3) that his confession to police officers was coerced; and (4) that it was reversible error to permit the district attorney to repudiate a promise of immunity in exchange for a second confession made by Williams. All contentions must be disallowed.

At the trial neither appellant took the stand. Both rested their cases without calling any witnesses or presenting any other evidence. The prosecution's proof may be outlined as follows:

On June 24, 1963, a San Francisco grocery store had been burglarized and certain identifiable Traveler's Express money orders had been stolen.

On the evening of June 25, 1963, in San Francisco, an unidentified person who resembled appellant Williams had snatched a purse from Mrs. Berta Erickson which contained, in addition to money, a wallet in which were her identification card and a Bank Americard.

Thereafter several of the stolen money orders were cashed. The person or persons cashing them had used the names, "James M. Williams," "James Williams," "Berta Erickson," "Paul Erickson," and "Carl Erickson." Mrs. Erickson, a People's witness at the trial, testified that the signatures on the money orders were not hers or her husband's. Nor had she ever purchased or possessed these money orders.

At 2:30 a.m., July 1, 1963, patrolling officers of the Sacramento Sheriff's staff, John Eustis and Richard Frost, observed a '63 Pontiac sedan being driven westerly on U. S. Highway 50, approximately 3 miles east of Perkins. Although its speed—40 to 45 miles per hour—was well within the speed limit, it was "weaving" from side to side (but within its lane), and other cars which had passed it seemed to be endangered so these officers deemed it to be a menace. They thought the driver was either intoxicated or was unfamiliar with the operation of the car's power steering and was "oversteering." After following the car for 2 or 2½ miles, the officers caused it to stop.

In the front seat were two young women, Divey Revels and her sister, Marlene Brown. Defendant Williams and one William Scott were in the back seat. Defendant Parks, the driver, got out of the car. He was asked for his driver's

license, had none, and stated the car had been borrowed from an unidentified friend. During this part of the conversation Williams volunteered no information.

Parks was asked to, and did, unfasten the registration certificate from the car's steering post and showed it to the officers. The officers had already noted the license plates on the car—KWM 821. However, the license number stated on the certificate was MVA 002, and the car was registered to "James Williams." Williams then identified himself and told the officers he owned the car. He stated he had no knowledge the license plates were not the ones issued therefor. Through radio inquiries the California Highway Patrol advised the officers that the license plates on the car had recently been reported stolen from another vehicle at Lake Tahoe. (Later members of the Highway Patrol joined the sheriff's officers.) Meanwhile, upon the officers' request, Williams gave his consent to a search of his car, during which the plates belonging to the car were found in the trunk compartment. Williams told the officers he did not know how the plates had been switched.

All members of the party were taken to the county jail. Upon arrival, the car was again searched and Mrs. Erickson's wallet and Bank Americard were discovered under the rear seat.

Thereafter all occupants of the car, except Parks, gave statements to the police. The men were charged with the offenses noted above. Both women testified for the People at the trial. So also did William Scott who had theretofore pleaded guilty to his participation in the crimes. From the testimony of these witnesses, the following appears:

Scott testified that Parks had met him on a street in San Francisco on the afternoon of June 29th. Parks told Scott he had won some bondified money orders from a sailor in a "dice game" and wanted to pass them in Reno. He needed transportation. Scott and Parks then went to Williams' residence. Williams joined them and furnished his car. A check protector was obtained and used to print dollar denominations on the money orders. The men visited the two girls, and a third, Mamie, at their residences and persuaded them to join them on the excursion. (Mamie left the party in Reno.) The girls were told that the purpose of the trip to Reno was to gamble at the casinos. The group drove to Reno where they gambled. The men cashed some of the money orders. Efforts to cash others were unsuccessful. There is no evidence

that the girls participated in or were aware of this money order cashing. Because of realization that the license number of Williams' Pontiac had been obtained and written on a money order by one of their victims, the men decided to steal and substitute license plates from another car. This was accomplished at the South Shore of Lake Tahoe.

Marlene Brown testified that when the officers had signaled their car to stop Parks had given her a "handful" of money orders, telling her to hide them on her person since the police would not search a woman. She did so and later disposed of them in a wastebasket at the county jail. When her sister, Divey, informed a matron that Marlene had the money orders, Marlene showed the matron where they had been put and they were recovered. (They were introduced in evidence.) Divey testified that Parks threw the wallet to her at the same time he had given the money orders to Marlene, and she had first hidden it in her bra and later disposed of it by putting it under the back seat where it was discovered as related above.

Williams, at the sheriff's office, made a statement to two officers. Their testimony established it was given freely, voluntarily and without coercion after Williams had been advised of his constitutional rights, including his right to an attorney. The statement coincided closely with Scott's testimony and that of the two girls. Added thereto was the information that two of the money orders had been cashed by him at a casino on the South Shore of Lake Tahoe and that he and Parks had gambled and lost the proceeds. He declared he did not want the girls to be accused as accomplices and go to jail for something they had not done.

 Appellants' principal contention is that the money orders, wallet and its contents introduced in evidence were obtained as the result of an illegal search and seizure. Their theory is that the movements of Williams' car on the highway did not justify an arrest, that the arrest was illegal and that the fruits of a search after an illegal arrest are inadmissible. The last of the foregoing assertions is a correct abstract statement of law. A search is not justified by what it turns up, and evidence obtained as the result of a search following an illegal arrest is inadmissible. (*People* v. *Haven,* 59 Cal.2d 713 [31 Cal.Rptr. 47, 381 P.2d 927].) Here the owner of the car gave consent to the search of the car, but such consent *if made immediately following an illegal arrest* would have been "inextricably bound up with the illegal conduct and cannot be segregated therefrom." (*People* v. *Haven, supra,* at p. 719.)

However, in the case at bench there was no arrest before the search and no illegal arrest thereafter. ■ It is true that a search made of an automobile without a search warrant after an arrest for a traffic violation only is illegal. (*People* v. *Molarius,* 146 Cal.App.2d 129 [303 P.2d 350].) But defendants were never arrested for any traffic violation. Appellants confuse the stopping of their car for purposes of interrogation with an arrest. (See 51 Cal.L.Rev. 907, 909, 910, citing *Moore* v. *State* (Okla. Crim.) 306 P.2d 358; *People* v. *King,* 175 Cal.App.2d 386, 390 [346 P.2d 235]; *People* v. *Ellsworth,* 190 Cal.App.2d 844, 846 [12 Cal.Rptr. 433].)

■ The stopping of this car under the circumstances described above was proper. Erratic "weaving" of appellants' car appeared to the officers to be endangering other motorists as they maneuvered to pass. The officers would have been derelict in their duty if they had not stopped the car to ascertain the cause of its weaving. Request made for inspection of the driver's license was routine. Request for inspection of the registration certificate was a natural concomitant. This, in turn, led successively to discovery (1) that the car's license plates were not those issued for that car; (2) that they were stolen; and (3) that the car's own plates were in the car's trunk. The search which produced the latter evidence and also the stolen wallet was made before arrest (although arrest before such discovery would have been with probable cause of a criminal violation of Vehicle Code section 4462 and therefore justified). Moreover, the search was made with consent. It was not illegal and the evidence which was its product was properly admitted in evidence. (*People* v. *Cowman,* 223 Cal.App.2d 109 [35 Cal.Rptr. 528]; *People* v. *Anguiano,* 198 Cal.App.2d 426 [18 Cal.Rptr. 132]; *People* v. *Koelzer,* 222 Cal.App.2d 20 [34 Cal.Rptr. 718]; *People* v. *King, supra,* 175 Cal.App.2d at p. 389.)

Appellant Williams, on the first day of trial, requested a continuance for the purpose of procuring private counsel. The request was denied.

The application of a defendant in a criminal action for a continuance of the trial based upon an effort to obtain different counsel is a matter within the trial court's discretion to grant or deny, and a denial of continuance will not be interfered with by a reviewing court in the absence of a showing of an abuse of discretion. (*People* v. *Dorman,* 28 Cal.2d 846, 849 [172 P.2d 686]; *People* v. *Whinnery,* 55 Cal.App.2d 794, 798 [131 P.2d 33]; and see *People* v. *Chessman,* 38 Cal.

2d 166, 174 [238 P.2d 1001].) There was no abuse of discretion in the case at bench. Williams had admitted he did not have money with which to employ an attorney. An attorney had been appointed by the court to represent him, and this attorney had in fact represented him during the preliminary examination and thereafter. Sometime before trial Williams had attempted to have relatives raise funds with which to employ another attorney. These attempts had been unavailing. When at the time of trial Williams made his request for a continuance there was no showing of his then present financial ability to employ counsel. Also, upon inquiry by the court, he expressly affirmed that he was being competently represented by his court-appointed counsel. Denial of the continuance was proper.

Appellant Williams' next contention that his statement given to the officers at the county jail was "coerced" because given under the belief that the girls would be held and prosecuted if he did not confess has no substance. There is no showing in the record that the officers made any representations or offered any inducements to Williams involving the girls. According to the testimony of the officers, which is uncontradicted, the statement given by Williams was wholly voluntary.

The last contention of appellants is that it was error to allow the district attorney's office to get a second statement from Williams induced by a promise of immunity and then to repudiate the promise. After an attorney had been appointed for Williams, the latter, upon the advice of the attorney, gave a formal statement to a deputy district attorney with a stenographic reporter present. The giving of this statement was attended by negotiations between Williams' attorney and the deputy district attorney for a deal whereby Williams would become a witness for the People at the trial of Parks in exchange for immunity. These negotiations were discontinued when it was learned that Williams had a prior record. The statement given to the deputy district attorney was not admitted in evidence. It is not entirely clear from the record how far the negotiations had progressed before they were discontinued, but for purposes of the discussion to follow we will assume that the claimed promise was given.

 A promise of immunity given by a district attorney, but not approved by the judge, cannot bind the State to dismiss the charge. Entry of a nolle prosequi (except in certain instances not here involved) has been abolished in Cali-

fornia; a district attorney can only recommend dismissal to the court. ■ Dismissal is within the latter's exclusive discretion. (Pen. Code, §§ 1385, 1386; *People* v. *Romero,* 13 Cal. App.2d 667, 670 [57 P.2d 557].)

■ However, a confession induced by a promise of dismissal could not be said to be voluntary. ■ But here the confession obtained during negotiations for immunity was not used. The trial judge properly stated it would not be admitted, and as a matter of fact, it appeared that it had not been transcribed by the reporter and that the prosecution had had no intention to use it. It was never brought to the attention of the jury in any way.

■ Exclusion from evidence of a confession obtained as the result of an unfulfilled promise of immunity might not in all cases erase all harm done a defendant. To permit *any other* substantial advantage so gained to be taken would seem to constitute courts and court officers as partners in a conscience-shocking "confidence" conspiracy to obtain convictions. Certainly, it could not be said to be an exacting from government of that "standard of rectangular rectitude when dealing with its citizens" discussed by Justice Carter (in another context) in *Farrell* v. *County of Placer,* 23 Cal.2d 624, 628 [145 P.2d 570, 153 A.L.R. 323]. And we think the endorsement of any harm to a defendant clearly traceable to seduced assistance by an accused could and should be dimly viewed by a reviewing court.

■ But in the case at bench, after a somewhat painstaking scrutinizing of the record, we can find no advantage of any kind taken of either defendant. Williams had already given a full uncoerced confession to the officers days before the assertedly tainted negotiations. The girls involved had freely related all they knew. (Whether Scott's confession and plea of guilty preceded or succeeded the negotiations with Williams does not appear.) No showing has been made that there was anything contained in the unused confession which could have added to the information already in possession of the prosecution. (The deputy district attorney who prepared and tried the case was not the person who had received the unused confession. The former represented to the court that the confession had not been transcribed and that he was unaware of its content.)

We find no error in the record and an overall appraisal thereof shows proof of guilt of both appellants so overwhelming that it is inconceivable the jury could have reached any

other verdict. There was no miscarriage of justice. (Cal. Const., art. VI, § 4½.)

The judgment is affirmed.

Friedman, J., and Van Dyke, J.,* concurred.

The petition of appellant Parks for a hearing by the Supreme Court was denied January 13, 1965. Mosk, J., did not participate therein.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.