594 P.2d 514
**STATE of Arizona, Appellee,**

v.

**Andrew JOHNSON, Travis Boyd Williams and Ronald White, Appellants.**

**No. 4151.**

Supreme Court of Arizona, In Banc.

April 4, 1979.

Rehearing Denied May 8, 1979.

Bruce E. Babbitt, Former Atty. Gen., John A. LaSota, Jr., Former Atty. Gen., Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Crane McClennen, Asst. Attys. Gen., Phoenix, for appellee.

Henry L. Zalut, Phoenix, for appellant Johnson.

Peter N. Serino, Phoenix, for appellant Williams.

Gregory R. Jordan, Phoenix, for appellant White.

STRUCKMEYER, Vice Chief Justice.

Appellants, Andrew Johnson, Travis Boyd Williams, and Ronald White, inmates of Arizona State Prison, were tried and found guilty of obstructing a criminal investigation, a violation of A.R.S. § 13–541.01. They were each sentenced to not less than four nor more than five years in prison; sentences to commence upon termination of their present terms of commitment. They appeal. We have jurisdiction pursuant to Rule 47(e)(5), Rules of the Supreme Court, 17A A.R.S.

On August 5, 1976, Reserve Deputy Ray Newby of the Maricopa County Sheriff's Department, pursuant to an order of Judge C. Kimball Rose, proceeded to the Arizona State Prison where he obtained custody of Charles W. Robinson, Donald Helgeson, Ronald White, Travis B. Williams, Andrew Johnson, and Paul Espinoza. Robinson, Helgeson, White, Williams, and Johnson were to be taken to the Maricopa County Jail where they were to be held pending their testimony in a murder trial. The record does not disclose why Espinoza was to be taken to the Maricopa County Jail.

Before leaving for Phoenix, the six men were handcuffed together and were placed in the enclosed rear section of a two and one-half ton van driven by Newby. When the prisoners were removed at the Maricopa County Jail in Phoenix, Arizona, Robinson had bruises and abrasions on his upper body which were not present when he was placed in the van at Florence. Newby noticed that Robinson's t-shirt, which was clean when he entered the van, was soiled. Helgeson suffered similar but less extreme changes.

Robinson told authorities, and later testified at trial, that on entering the van White began questioning Helgeson about why he was being returned to Phoenix. Helgeson answered that he didn't know, but thought it was to testify in the murder trial of Leroy McCowan. Shortly afterward, White, with the assistance of Williams and Johnson, kicked and choked Helgeson and forced him to perform an act of fellatio.

Afterward, White asked Robinson questions which were similar to those which had been asked Helgeson. They were particularly interested in how Robinson became involved in the McCowan case. Robinson's answers did not satisfy appellants, so they attacked him, forced him to the floor of the van and stood on his neck until he was unconscious. When Robinson regained consciousness, he was asked if it was still his intention to testify in the McCowan case, to which he replied, no. Thereafter more discussion ensued, followed by another attack during which Robinson was rendered unconscious as in the first attack. Appellants were subsequently indicted and convicted of obstruction of justice.

From an examination of the appellants' position, we have concluded that there are ten issues presented for decision.

A. Was the agreement between appellant Johnson, his counsel and the prosecutor breached and, if so, is appellant entitled to a new trial?

B. Was the cross-examination of appellant Johnson concerning his confrontation by detectives of the Maricopa County Sheriff's Department a deni-

al of the right against self-incrimination?

C. Was the conduct of the prosecutor during trial sufficient basis for granting a reversal of appellants' conviction?

D. Did the trial court commit error in refusing to grant appellants' motions for separate trials?

E. Was there a denial of due process and a violation of Arizona Rules of Criminal Procedure as a result of pretrial delay?

F. Did the trial court commit error in refusing to strike Officer Pomush's testimony and to grant a mistrial because he had destroyed the rough notes taken during the initial interview with the victim, Charles Robinson?

G. Did the trial court commit error in refusing to grant defense counsels' motions for mistrial based upon the use of shackles during trial?

H. Was the failure of the court to declare a mistrial on the announced deadlock of the jury an abuse of discretion?

I. Was the failure of the State to produce the doctor's report on the victim reversible error?

J. Were there sufficient prejudicial events that the jury could not render a fair and impartial verdict?

### BREACH OF AGREEMENT

It is undisputed that Johnson, his attorney, and the prosecutor met to determine whether Johnson would testify for the State in the McCowan murder trial. Against the advice of his counsel, Johnson agreed to testify and was present at the trial but was never called to the witness stand. Thereafter, prosecution was instituted in the present case. Johnson moved to dismiss the charges because the prosecutor had promised to drop the charges against him if he *agreed* to testify. The court denied the motion after it heard the testimony of appellant's former attorney. It was of the opinion that the effect of the agreement was that if appellant actually *testified*, the charges would be dropped.

■ The dismissal of a prosecution is governed by the Arizona Rules of Criminal Procedure, 17 A.R.S. Rule 16.5 states in part:

"Dismissal of Prosecution

a. On Prosecutor's Motion. The court, on motion of the prosecutor showing good cause therefor, may order that a prosecution be dismissed at any time upon finding that the purpose of the dismissal is not to avoid the provisions of Rule 8."

The comment following this rule indicates that the policy of the 1956 Arizona Rules of Criminal Procedure, Rule 239, was retained, in that once a criminal action is filed, the county attorney does not have the sole discretion to decide whether to dismiss. The Superior Court on good cause shown may order that a prosecution be dismissed.

In *Application of Parham*, 6 Ariz.App. 191, 193, 431 P.2d 86, 88 (1967), the Court of Appeals, in addressing a similar issue, said:

" * * * While a prosecuting attorney has discretion in deciding whether to bring a criminal action (*Taliaferro v. City of San Pablo*, 187 Cal.App.2d 153, 9 Cal. Rptr. 455 (1960)), he has no authority to dismiss a pending criminal prosecution. He can only recommend dismissal to the court but actual dismissal is solely within the court's discretion. Rule 239, Rules of Criminal Procedure, 17 A.R.S.; see *People v. Parks*, 230 Cal.App.2d 805, 41 Cal. Rptr. 329 (1964)."

■ The prosecuting attorney did not have the sole authority to agree to a dismissal. His role was limited to recommending to the court that the case be dismissed. Any agreement exceeding this limited scope of authority would be void and unenforceable.

■ Appellant Johnson argues that the court erred when it refused to allow Gerald Moore, Johnson's former counsel, to testify. It is asserted that as a result, Johnson changed his strategy and took the stand to

testify in his own behalf and that this was a violation of the Fifth Amendment to the United States Constitution and Article 2, § 10 of the Arizona Constitution because Johnson was thereby compelled to take the stand to explain certain matters to the jury. We do not agree.

In *State v. Rodriquez,* 113 Ariz. 409, 413, 555 P.2d 655, 659 (1976), the appellant argued that because the trial court "found his statements to be admissible, he was forced to take the stand 'in an attempt to balance and correct what he viewed as improper admission of his confession.'" We quoted from *Harrison v. United States,* 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968), stating that:

"A defendant who chooses to testify waives his privilege against compulsory self-incrimination * * * and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him."

## CROSS–EXAMINATION OF APPELLANT JOHNSON

Appellant urges that the prosecution's line of questioning on cross-examination was an attempt to project into the trial the fact that the defendant had not answered questions relating to how the offense occurred, thereby penalizing him for exercising his Fifth Amendment right to remain silent. The significant portion of the cross-examination as taken from the Reporter's Transcript is:

"Q. You said your lip was cut.

A. Yes, it was.

Q. How badly?

A. Not too bad.

Q. Could anyone see it?

MR. ZALUT: I object. Calling for a conclusion on the part of the witness.

THE COURT: Over-ruled.

Q. (By Mr. Cantor): Were you interviewed by this Officer here (gesturing)?

A. No.

Q. Never spoke to him?

A. No.

Q. Are you telling the Jury, you never were confronted by this Officer here?

A. I was confronted by two Officers. I don't know who they are.

Q. It could have been this Officer here (gesturing)?

A. As I say, I don't know whether they were. I didn't speak to them. I just turned around and went back to my cell."

■ This testimony must be read in the light of the defendant Johnson's defense that he and the victim had been in nothing more than a fight. Johnson's answer was not in any way responsive to the question: "Could it have been this Officer here?" Since the answer was volunteered, the State should not be held responsible for a possible damaging inference arising from it.

■ However, if the prosecution's questions could be considered as a deliberate attempt to bring out the fact that defendant had claimed his constitutional right to remain silent, it is plainly harmless beyond a reasonable doubt. See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Anderson,* 110 Ariz. 238, 517 P.2d 508 (1967). Where evidence of guilt is overwhelming, as here, it has repeatedly been held that the error in bringing out a defendant's silence is harmless. *Booten v. Hanaver,* 541 F.2d 296 (1st Cir. 1976); *Chapman v. United States,* 547 F.2d 1240 (5th Cir. 1977); *Meeks v. Havener,* 545 F.2d 9 (6th Cir. 1976); *Hayton v. Egeler,* 555 F.2d 599 (6th Cir. 1977); *United States v. Wycoff,* 545 F.2d 679 (9th Cir. 1976); *United States v. Helina,* 549 F.2d 713 (9th Cir. 1977).

## PROSECUTORIAL MISCONDUCT

Appellants assert that during the course of final arguments the prosecution made numerous statements concerning the facts of the case which were not supported by the evidence. Appellants argue that the court erred when it refused to allow them to object during closing argument. We note that only appellant Williams objected during closing argument:

"[Counsel for Williams]: Your Honor, I would object.

COURT: We are not going to interrupt argument."

In *State v. White*, 56 Ariz. 189, 193, 106 P.2d 508, 510 (1940), the prosecutor made certain statements during closing argument to which the defense failed to object. Addressing the issue of whether the failure to object waives the error, we said:

"We have held repeatedly that when an appeal is taken to this court, on the ground that an attorney was guilty of improper conduct in the course of a trial, if no objection is made by the appellant in the trial court, the objection is waived. This, however, is required so that the trial court may have an opportunity of itself correcting its error, * * *."

In *State v. Evans*, 88 Ariz. 364, 371, 356 P.2d 1106, 1110 (1960), we explained the holding in *White*:

"The last sentence of *State v. White*, * * means only that an objection must be lodged either during the final argument of *opposing counsel or at the completion of the final argument*. It does not mean that the objection may be omitted entirely and brought up in the motion for new trial. The long standing rule of this court, *Blackburn v. State*, 31 Ariz. 427, 254 P. 467, that any objection to remarks of counsel should be offered at the time the statements are made so that the lower court may instruct the jury to disregard the comments was not modified by *State v. White*." (Emphasis added.)

Claimed errors occurring during arguments must be preserved as a minimum by an objection at the close of the argument. However, because the trial court's statement concerning interruption of arguments could have been interpreted as a ruling that no objections would be allowed, we will assume that all appellants registered appropriate objections.

The misstatements, according to appellants, could have resulted in their convictions. They set out the following examples:

1. That the victims were almost killed.
2. That the defendants were smirking and acted like animals.

3. That appellant White was the sweetheart of Robinson.
4. That the defense attorneys are going to throw the jury a lot of bones.
5. That the witnesses, whether prisoners or not, are people like the jurors. That the function of the jurors ceases somewhere down the line, but they cannot permit things like this to happen, not even for a second.
6. That the victims were yelling and screaming in the van in pain.
7. That it makes no difference whether it's prisoners that are being tortured or people like the members of the jury.
8. That actions such as this cannot be tolerated by any jury or allowed to occur in any court of law. That the jury must stop this.
9. That the prosecutor kicked his chair and apologized to the jury for getting angry, but that this case infuriated him.
10. That it's hard enough to get witnesses up from the prison who want to testify.
11. That the purpose of a police departmental report is so that the defense attorneys can have the information and find out what the case is all about.

We find without exception that the statements were either the result of invited error, see *State v. Fish*, 109 Ariz. 219, 220, 508 P.2d 49 (1973), were supported either directly or inferentially in the record, or the asserted prejudicial argument cannot be found in the record. As an example, the jury could have inferred that Robinson was near death when he went into convulsions and lapsed into unconsciousness while in the van coming from Florence. The statement that the prosecutor kicked his chair in a fit of anger is not supported by the record.

## FAILURE TO GRANT A SEVERANCE

On several occasions before and during the trial, appellants moved for severance. Appellants complain of three occasions in particular. First, on January 12, 1977, Johnson moved to sever, alleging that

he would be prejudiced by the introduction of testimony concerning the homosexual acts of his codefendants. Second, appellants White and Williams moved to sever on January 10, 1977, when counsel for appellant Johnson moved for a continuance because of illness. The court initially granted this motion, but changed its ruling when Johnson would not waive jeopardy.

On February 3, 1977, counsel for Johnson again requested a continuance because of illness. The court again denied White's and Johnson's renewed motions to sever.

We do not think there was reversible error in the denial of the motion for severance because of illness of counsel. We have said:

"A trial judge's discretion in granting or refusing a requested severance will not be reversed absent a clear abuse of discretion, and failure to demonstrate prejudice or clear abuse of discretion means failure of the issue on appeal." *State v. Moncayo,* 115 Ariz. 274, 276, 564 P.2d 1241, 1243 (1977).

■■■ Appellant Johnson's claim that he was prejudiced by the introduction of testimony concerning the homosexual act between his codefendants and Helgeson is completely without foundation. Johnson's argument seems to be that the same evidence would not be admissible against him had he been given a separate trial. But we do not think so. Robinson testified:

"Q. Now, after these conversations, did any physical action take place? Would you tell the Jury what it was, if any?

A. Yes. There was Ronald White, who was handcuffed immediately next to Donnie (Helgeson); swung him (Helgeson) across the van towards Travis Williams.

Travis grabbed him—*so did Andrew* [Johnson]. They held him. Ronald White forced him down into a kneeling position. He kicked him several times.

Donnie tried to scream. And he pinched his throat to where no sound could come out.

Travis Williams told Donnie that he wanted him to * * * such [sic] his penis." (Emphasis added.)

This testimony of Robinson implicates Johnson as a participant in the homosexual act. It would therefore be admissible in a separate trial, just as it was admissible in the joint trial.

## PREJUDICIAL TRIAL DELAY AND DUE PROCESS

Appellants next claim that they were denied due process as a result of prejudicial trial delays. More specifically they claim a violation of their right to a speedy trial. This claim arises out of these circumstances.

On August 12, 1976, appellants were indicted by the Maricopa County Grand Jury. They were arraigned on August 18, 1976. As a result of two successive motions by appellant White, the court continued the matter to December 15, 1976. On December 16, the court noted that the prosecutor was engaged in another trial and entered its order continuing the trial until December 27, 1976, at which time the jury was sworn. Appellants complain that the court violated Rule 8.5, Rules of Criminal Procedure, 17 A.R.S., which states:

"a. Form of Motion. A continuance within the time limits of Rule 8.2(b) and (d) may be granted only upon written motion, stating with specificity the reasons justifying it, and a certificate of the signer that is made in good faith."

■■■ A trial court's order continuing a trial does not violate Rule 8.5, however, unless a defendant's trial was delayed beyond the speedy trial period contained in Rule 8.2. If there is an excluded time, there is no prejudice resulting from the granting of the continuance. *State v. Barnett,* 112 Ariz. 210, 540 P.2d 682 (1975). In the present case, a total time of 131 days elapsed between arraignment on August 18 and the swearing of the jury on December 27, 1976. During this time, appellant White made and the court granted two consecutive motions to continue, which accounted for 45 days of properly excludable time. By subtracting the excludable time from

the total days elapsed, the number of days that have elapsed is obtained for the purposes of determining whether Rule 8 has been violated. The jury was sworn in the 86th day after arraignment, four days prior to the 90-day maximum.

■ On December 27, 1976, the court impaneled the jury and thereafter ordered a recess until January 4, 1977, because the prosecutor scheduled to try this case was still engaged in another trial. Appellants contend that the impaneling of the jury followed by an eight-day recess was an obvious subterfuge in violation of Rule 8. We do not agree.

In *State v. Ferguson,* 120 Ariz. 345, 347, 586 P.2d 190, 192 (1978), the court ordered the jury impaneled on the ninetieth day after arraignment and then ordered a fourteen-day recess. The defendant argued that impaneling the jury on the last day of the Rule 8 time limit was a mere subterfuge. We held:

"The purpose of Rule 8 is to insure that a criminal defendant is not forgotten while the orderly administration of justice swirls around him on all sides but leaving him untouched. In a real sense, however, the impaneling of the jury denotes the commencement of the trial. It appears, according to the transcript and minute entries, that the delay in starting the trial occurred because the prosecutor, * * * was trying another case * *. Nevertheless, 14 days approaches the outer limits of permissible delay. Delay much longer than this would compel us to find a violation of Rule 8."

The eight-day delay in the instant case is well within the limits announced in *Ferguson.*

Thereafter, on January 3, 1977, one day before evidence was to be taken, the court was informed that Henry Zalut, counsel for appellant Johnson, had been hospitalized and could not appear. Over the objections of White and Williams, the court ordered a seven-day recess. At the end of this recess it was revealed that Mr. Zalut required surgery. Counsel from Zalut's office then moved for a further continuance. The court then recessed until February 7, 1977. Appellants renewed their objections.

■ On February 3, 1977, counsel from Zalut's office again moved for a 30-day recess, which the court granted over the objections of the State, Williams and White. Appellants admit that the delays occurring after January 4, 1977 were occasioned by illness of a co-defendant's counsel. Delay occasioned by or on behalf of one of several defendants is attributable to his co-defendants for the purpose of determining whether the speedy trial time limits have been violated. *State ex rel. Berger v. Superior Court,* 111 Ariz. 335, 529 P.2d 686 (1974). See also, 17 A.R.S., Rules of Criminal Procedure, Rule 8.4(e).

■ Appellants argue that the court should have granted a severance pursuant to Rule 8.4(e) in order to shorten the delay and "preserve the applicable time limits." However, we do not think that the rule on "applicable time limits" is concerned with the delay after the jury was sworn in on the 86th day following the appellant's arraignment. We certainly do not approve of the delays in this case. But since such delays must in the end be left to the sound discretion of the trial judge, we will not reverse unless it appears that substantial prejudice occurred. No such prejudice appears from the record.

■ Appellants also claim error resulting from delay when the trial court ordered a recess to allow a member of the jury panel to take a planned vacation. This delay resulted from the fact that in the selection of the jury, one juror, Mrs. Mary Lynn Kerr, informed the court that she had been planning a vacation for some time and that it could not be postponed. The court assured her that the trial would not interfere with her plans.

On March 10, 1977, the court made the following statement:

"Mary Lynn Kerr is planning to take a vacation starting Saturday—leaving Saturday morning. Will counsel stipulate— We have nine Jurors, and that tomorrow

she will be the alternate, in case the trial goes on and they have to come back Monday to deliberate. Otherwise, I will turn off the deliberations whenever Friday if they can't agree. I won't hold them over.

If we draw the alternate by lot, I can only do this by stipulation of counsel. This would not be done until tomorrow at the conclusion of the case, to be sure we have nine Jurors, in case somebody gets sick between now and tomorrow.

MR. CANTOR: The State will stipulate she may be the alternate.

THE COURT: I want to know, will you agree to her, that she is the alternate?

If we have nine Jurors on the case, concluded by the time of the final argument, when we agree to and give the case to the Jury, then I also say the instructions, and say, 'Eight of you will deliberate, and there are nine of you sitting there; the alternate has been drawn or designated,' and then I announce if you will agree."

Counsel for appellant Johnson would not stipulate to Mrs. Kerr's designation as the alternate. The court later ordered a ten-day recess while Mrs. Kerr completed her vacation. Appellants argue that they were prejudiced by this delay because of the obvious inability of the jury to recall the testimony. However, we do not think this was prejudicial since after the jurors commenced their deliberations, certain of the testimony in which the jury was interested was read to it.

### DESTRUCTION OF NOTES

■ After discovering the condition of Helgeson and Robinson, Deputy Newby booked the six prisoners into the Maricopa County Jail. Robinson was then interviewed by Detective James Pomush. During an interview, Pomush made notes and recorded Robinson's statement. When Pomush wrote his final report, he used the recording, his notes and his memory.

At the trial, the following testimony was elicited from Detective Pomush:

"Q. Is there anything in your rough notes that was not reflected in your Departmental report?

A. I'm sure there's a lot of things that weren't reflected in the report.

Q. Do you have any rough notes still in existence?

A. No, I don't.

Q. Do you know where they are?

A. No, I don't.

Q. Did you destroy them yourself?

A. I don't recall what happened to them."

Appellants urge on appeal that the "destruction" of Detective Pomush's notes resulted in reversible error.

The Federal courts have considered this problem in a series of cases in which FBI agents intentionally destroyed notes which were made during interviews or interrogations. Typically these notes were destroyed after they had been incorporated into the agent's final report, a copy of which was available to the defense. The leading case is *Killian v. United States,* 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), in which the defendant was charged with falsely swearing in an affidavit that he was not a member of the Communist Party. The government's case depended on the testimony of two informants who joined the Communist Party at the request of the FBI. On cross-examination, both informants testified that they were reimbursed for their expenses which they orally reported to an FBI agent. The agent made notes of the amounts and later reimbursed each informant in cash. The defendant moved for production of the notes. It was subsequently revealed that the notes had been destroyed before trial, but not before the information had been transferred to receipts which the informants had signed.

The Supreme Court remanded the case to the district court with instructions to make three findings of fact: (1) whether the notes were made only for the purpose of transferring the data to receipts, (2) whether the agent acted in good faith, and (3) whether the agent acted in accordance with normal procedure of the agency in destroying the notes. The Court stated:

"If the agents' notes of * * * oral reports of expenses were made only for the purpose of transferring the data thereon to the receipts to be signed, * * and if, after having served that purpose, they were destroyed by the agents in good faith and in accord with their normal practice, it would be clear that their destruction did not constitute an impermissible destruction of evidence nor deprive petitioner of any right.

*     *     *     *     *     *

It is entirely clear that petitioner would not be entitled to a new trial because of the nonproduction of the agents' notes if those notes were so destroyed and not in existence at the time of the trial." *Id.* at 242, 82 S.Ct. at 308-309.

Initially and almost uniformly, lower federal courts followed the reasoning of *Killian.* See e. g., *United States v. Covello,* 410 F.2d 536 (2d Cir. 1968), *cert. denied* 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969); *United States v. Lepiscopo,* 429 F.2d 258 (5th Cir. 1970), *cert. denied* 400 U.S. 948, 91 S.Ct. 255, 27 L.Ed.2d 254 (1970); *United States v. Fruchtman,* 421 F.2d 1019 (6th Cir. 1970), *cert. denied* 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 86 (1970); *Ogden v. United States,* 323 F.2d 818 (9th Cir. 1963), *cert. denied* 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86 (1964). See also, Comment, Judicial Response to Governmental Loss or Destruction of Evidence (1972), 39 U.Chi.L. Rev. 542, 549.

The Fourth Circuit, however, questioned the practical effects of *Killian* in *United States v. Johnson,* 337 F.2d 180, 201–02 (4th Cir. 1964), saying:

"This is not the first time that a court has been called upon to consider the effect of the destruction of FBI interview notes. [Citations omitted.] Each time the problem has arisen the FBI has claimed that the notes were destroyed as part of FBI routine. This is really not a satisfactory answer."

The Ninth Circuit, in *United States v. Carrasco,* 537 F.2d 372 (9th Cir. 1976), recognized, as did the Fourth Circuit, that:

"It may be that the agent * * * who adapts a final report from preliminary memoranda will tailor his observations to fit his conclusions."

In *United States v. Harrison,* 173 U.S. App.D.C. 260, 524 F.2d 421 (1975), the District of Columbia Court of Appeals refused to follow the *Killian* approach. It observed:

"[The] reasoning follows a common pattern: the destruction is not grounds for reversal because the court finds that the agent has acted in accordance with normal agency procedures, and that the defendant has made no showing of either bad faith or a failure to transfer to the interview report all the data that appeared in the notes. In nearly every such case, however, the only solid evidence a defendant could offer to show either bad faith or failure to transfer all data would come from producing the notes themselves—exactly the course he cannot pursue because of the agency's practice." 173 U.S.App.D.C. 270–271, 524 F.2d 431–32.

Finally the argument was rejected in *United States v. Harris,* 543 F.2d 1247 (9th Cir. 1976), that the good-faith destruction of rough notes in accordance with normal FBI procedure was justifiable. It was held that the routine disposal of potentially discoverable materials amounts to a usurpation of the judicial function of determining what evidence should be produced in a criminal case. It was also held that original or rough notes of an interview must be preserved.

In each of the cases discussed, the courts were construing the Jenks Act.[1] While the Jenks Act is not applicable to the states, the conclusions reached are significant to the decision here. Rule 15.4(a)(2) reads:

"Handwritten notes which have been substantially incorporated into a statement shall no longer themselves be considered a statement."

Where, as here, the officer writing a report testifies that " * * * a lot of things * *

[1]. 18 U.S.C. § 3500

weren't reflected in the report," the court is left with little basis to judge compliance with the above-indicated portion of the rule. However, neither counsel developed the issue and there is therefore no indication of prejudice to the defendant. A caveat to law enforcement officers may well be added to the comment on the rule. Comply with the rule by substantially incorporating the notes in the statement or report so that if the original notes are lost or destroyed, testimony can be introduced to that effect.

Appellants essentially argue that they were denied due process because the State destroyed evidence which might have been exculpatory. We recently discussed this point in *State v. Hughes and Soloman,* 119 Ariz. 261, 580 P.2d 722 (1978). There, Soloman pled guilty to a charge of first degree rape while armed with a knife. Because he was not fully informed by the court of the special conditions of sentencing, we remanded to the Superior Court to determine, if possible, whether the guilty plea was not intelligently made. On retrial it was determined that most of the physical evidence had been lost or destroyed after the first trial. On appeal, Soloman urged that the loss of evidence by the State had violated his right to due process by forever depriving him of the opportunity to a fair and just trial. In response to this argument, we noted that this was not a case dealing with discovery—"one in which evidence possibly favorable to the accused has been withheld from him."

We held that:

"where, as here, a defendant has had the opportunity to inspect the evidence, there is no bad faith or connivance on the part of the State and it does not appear that a defendant has been prejudiced by the loss of evidence, there is no compelling reason to either dismiss the charge or charges against him or to suppress any reference to otherwise competent evidence." *Id.* at 264, 580 P.2d at 725.

At the outset, we observed that there was no evidence of bad faith on the part of the State. Moreover, appellants do not suggest they were prejudiced by the loss of the notes. Both Detective Pomush and Robinson testified at the trial. Appellants had the opportunity to cross-examine them concerning any facts which would support their defenses or theories of what occurred. Appellants could also have called Paul Espinoza, the sixth person present in the rear of the van, who could have testified in contradiction to the officer's testimony, if that were the case.

### SHACKLING BEFORE JURY

Appellants assert next that the court committed reversible error when it allowed appellants to appear before the jury shackled (leg irons) and heavily guarded. Whether a defendant will appear before the jury shackled and guarded is within the sound discretion of the trial court. *State v. Reid,* 114 Ariz. 16, 559 P.2d 136 (1976); *State v. Watson,* 114 Ariz. 1, 559 P.2d 121 (1976). We stated in *Reid* that:

"When * * * the defendant objects to being tried in shackles or handcuffs there must be some reason in the record to support such actions." 114 Ariz. at 22, 559 P.2d at 142.

The record in this case supports the action of the trial court.

After considering information provided by the sheriff on prior violent conduct of appellants, the court believed there was need for some type of restraint. It said:

"THE COURT: I would like to point out for the record that these men are dangerous. The Sheriff is responsible for security, and rather than have them come in handcuffed, which would be necessary, some kind of restraint is indicated; but this is the least conspicuous, less challenging sort of thing."

We think the trial court demonstrated its desire to present the appellants to the jury in the least oppressive light possible under the circumstances, and did not abuse its discretion in restraining appellants.

Appellants argue that there was no evidence that they had tried to escape or that they would be violent in the court room. But a trial court need not wait until an

escape or other violence has occurred in its presence before exercising its discretion.

## DEADLOCK OF JURY

After the jury retired to deliberate, word was sent to the judge that the jurors wanted a transcript of the testimony of appellant Williams. Defense counsel would not agree that a transcript of Williams' testimony would be submitted to the jury. While the matter was being argued to the court, several other notes were sent out by the jury. The last read: "Without the transcript, we are unable to reach an agreement." From this note, appellants conclude that the jury was hopelessly deadlocked and that the court should have declared a mistrial. We think, however, that the note can reasonably be interpreted to mean that the jury members differed in their recollection as to how the witness testified and that in order to resolve those differences they needed the transcripts.

Under Rule 22.3, Arizona Rules of Criminal Procedure, 17 A.R.S., it is within the sound discretion of the court to determine whether the jury should have testimony from the trial read to them. That rule provides:

"After the jurors have retired to consider their verdict, if they desire to have any testimony repeated, or if they or any party request additional instructions, the court may recall them to the courtroom and order the testimony read or give appropriate additional instructions. The court may also order other testimony read or give other instructions, so as not to give undue prominence to the particular testimony or instructions requested. Such testimony may be read or instructions given only after notice to the parties."

The court did not abuse its discretion in settling the disagreement between counsel by having all the testimony read back to the jury.

The jury also sent the court this note: "Do we have to be present when the verdict is read?" It is argued from this note that the jury was intimidated by the defendants and that, therefore, the jurors must have been prejudiced against them. Even if we assume that the jurors were intimidated by the defendants, we do not think it necessarily follows that they were so prejudiced against them that they would return a verdict of guilty if not convinced beyond a reasonable doubt.

## FAILURE TO PRODUCE DOCTOR'S REPORT

Appellants sought to discover an asserted Arizona State Prison psychologist's report on Charles Robinson, one of the victims. The State was unable to produce such a report. Appellants urge that because of its non-production, Robinson's testimony should have been excluded from the trial. We think the following statement by the prosecuting attorney discloses adequate grounds for its nonproduction:

"Further, Your Honor, as to one of the motions for discovery, while Mr. Robinson advised me that he had not had any psychiatric, psychological workup, we still sent down to the Warden for anything they had. It came back today, hand-delivered, a letter to Your Honor, which you have seen, which I have given to counsel.

The Defendants now have it. Signed by, I believe, the Warden, by the psychologist. They both said there was not such a report, nor had there ever been such a report. They know of no psychological problems.

I have nothing to furnish them. There is nothing I know of. If there is, I know nothing further."

## FAIR AND IMPARTIAL VERDICT

Appellants argue that a fair and impartial trial could not be had because of the number of prejudicial events which occurred. The events referred to by appellants include those discussed above and the following incident. Shortly after the jury retired, appellants were removed from the court room to the holding tank. In order to reach the holding tank they had to pass through the hallway just outside the jury

room. While moving through the hallway, appellant Williams attacked a guard. A scuffle ensued which lasted approximately thirty seconds. While the door to the jury room was closed and locked, the jurors were aware that an incident of some kind occurred. One of the jurors later read an account of the incident in a newspaper and the next day discussed the newspaper story with the other jurors. The court conducted an inquiry into the matter and asked each juror whether he could still render a fair and impartial verdict. All indicated that they could.

The trial judge believed the jury could render an impartial verdict and we are convinced that the jurors were correct in their assessment of the facts.

Appellants, however, point out that the newspaper account which was discussed by the jurors contained an erroneous statement of fact. We do not think it was such an error as would work to the appellants' disadvantage.

Finally, appellants argue that when all the events are considered together, they amount to prejudice. We have previously held in State v. Fleming, 117 Ariz. 122, 571 P.2d 268 (1977):

> "Defendant contends that all other arguments when taken together demonstrate that he did not receive a fair trial. Since we have found that there was no error in any of the claims presented, we cannot say that any prejudice suffered by the defendant indicates that he did not receive a fair hearing."

Judgments affirmed.

HAYS and HOLOHAN, JJ., concur.

GORDON, Justice (dissenting in part and concurring in part):

I dissent from the majority's conclusion that despite the lengthy delay in bringing the defendants to trial, no prejudice occurred. Over their repeated objections, defendants White and Williams were brought to trial approximately 72 days after the maximum time limits allowable under 17 A.R.S., Rules of Criminal Procedure, rule 8.

This was not a per se violation of the defendants' speedy trial rights, however, because a jury had been impaneled within the time limits of rule 8.

The majority opinion properly cites State v. Ferguson, 120 Ariz. 345, 586 P.2d 190 (1978), for the proposition that fourteen days of delay, after a jury has been impaneled, approaches the outer limits of permissible delay. Although that case dealt with delays caused by the prosecution, we stated that "[d]elay much longer than this would compel us to find a violation of Rule 8." State v. Ferguson, 120 Ariz. 345, 347, 586 P.2d 190, 192.

Most of the delay in the instant case was caused by the illness of counsel for one of the three defendants. This is analogous to delay caused by the state in that it was not precipitated by the other two defendants, nor was it condoned by them. (A previous motion for severance had been denied.) When defendant Johnson's attorney moved to continue, and counsel for Williams and White objected, the cases of Williams and White should have proceeded to trial.

Severance is not always mandated to preserve the speedy trial rights of one defendant. Because of the nature of the delay, however, and because all of the remaining parties were ready and willing to proceed to trial, severance should have been granted to preserve the applicable time limits. See 17 A.R.S., Rules of Criminal Procedure, rule 8.4.e. The resulting delay so far exceeds what we have previously deemed permissible that it subverts the very purpose of rule 8 and is, in and of itself, prejudicial.

I also strongly disapprove of the trial court's continuing the trial for ten days and allowing the jury to depart unsequestered, in order to accommodate a juror's vacation schedule. Because the jury could not remember portions of the testimony, all of the evidence had to be read back to them, causing further delay. I feel that the combined effect of these delays prejudiced all three of the defendants and deprived them of a fair trial.

The majority opinion cites *State v. White,* 56 Ariz. 189, 106 P.2d 508 (1940) for the proposition that if no objection is made by the appellant in the trial court, the objection is waived. I agree with this statement of the law but simply add that if the error amounts to fundamental error, we are compelled to review it whether or not a proper objection was made at trial. A.R.S. § 13–4035B; *State v. Rose,* 121 Ariz. 131, 589 P.2d 5 (1978).

I would agree with the majority as to its handling of the remaining issues.

CAMERON, Chief Justice (concurring):

I concur with Justice Gordon.